EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

J.C. PENNEY COMPANY, INC., Defendant.

Civ. No. 79 74034.

United States District Court, E.D. Michigan, S.D.

Dec. 6, 1985.

Martin A. Scott, Detroit, Mich., for plaintiff.

Robert A. Marsac, Detroit, Mich., for defendant.

## MEMORANDUM OPINION

### (FINDINGS OF FACT—CONCLUSIONS OF LAW)

DeMASCIO, District Judge.

The Equal Employment Opportunity Commission (EEOC) filed this Title VII action, 42 U.S.C. § 2000e, *et seq.*, to challenge J.C. Penney Company's (J.C. Penney) "head of household" test of eligibility for spousal coverage under J.C. Penney's medical and dental benefit plan. Under this test, a J.C. Penney employee can apply for and obtain medical and dental coverage for his/her spouse only if the employee earns more than the spouse. On November 21, 1973 and again on September 13, 1974, Imogene Slocum, a former employee of J.C. Penney, filed charges with the EEOC, claiming that the "head of the household" test is discriminatory on the basis of sex. The EEOC conducted an investigation into Ms. Slocum's charges and issued a determination in April 1976. When conciliation failed,

EEOC filed this action based exclusively on Ms. Slocum's charges.[1]

As of 1983, J.C. Penney, a national retail department store, employed 165,864 employees referred to as "associates." Of that number, 122,048 are female associates. The majority of all associates is employed part time and the majority of part-time associates is female. Prior to February 1, 1971, J.C. Penney's plan offered coverage to the spouse of male associates, while offering no coverage to the spouse of female associates. On February 1, 1971, this obviously discriminatory plan was replaced with a "head of household" rule. Before adopting this "head of household" provision, J.C. Penney reviewed 20 to 30 medical plans offered by other retail and non-retail employers. J.C. Penney did not, however, utilize employee surveys to determine its associates' coverage needs prior to adopting its current plan. At trial, EEOC contended that J.C. Penney adopted the "head of household" provision to intentionally continue its pre-1971 discriminatory plan.

Simultaneous with its adoption of the "head of household" rule, J.C. Penney began offering a dental plan to its associates, with eligibility conditioned on enrollment in the medical plan. J.C. Penney estimates that the added cost of providing the dental plan was approximately equal to the cost savings realized through the use of the "head of household" requirement.[2] A J.C. Penney associate is eligible for participation in the medical and dental plans upon working at least 20 hours per week for 13 consecutive weeks, or a total of 260 hours over that same period. Once eligible, the associate may obtain self coverage, as well as coverage for dependent children up to a specified age. The plans are voluntary and contributory in nature, with J.C. Penney paying approximately 75% of the costs and the participating associate paying the remaining 25%. For contribution purposes, there are three categories of coverage under the plan: (a) associate only, (b) associate and one dependent, and (c) associate and two or more dependents. There is no separate coverage category for the associate's spouse, who is simply considered a "dependent."

■ In February 1981, J.C. Penney filed a motion for summary judgment, which we granted in part on November 16, 1981. At that time, this court held that the "head of household" provision could be challenged only under § 703(a)(1) of Title VII, 42 U.S.C. § 2000e–2(a)(1). *See* appendix. Under § 703(a)(1), it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin." The United States Supreme Court has held that the word "discriminate" in § 703(a)(1) should be construed similarly to cases under the fourteenth amendment's equal protection clause. *General Electric v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 543 (1976). A case of discrimination under the fourteenth amendment equal protection clause requires proof of discriminatory intent. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Thus, in order to prevail under § 703(a)(1), EEOC must prove by a preponderance of the evidence a discriminatory intent or motive on the part of J.C. Penney in adopting the "head of household" requirement.

■ The standard that we employ is "whether the evidence shows treatment of a person in a manner which, but for that person's sex, would be different." *Newport News Shipbuilding & Dry Dock v. E.E.O.C.*, 462 U.S. 669, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983). The "head of house-

---

1. The stipulated facts culminating in this action are fairly summarized in a joint pretrial order.

2. J.C. Penney now offers its employees a comprehensive benefit package that includes a medical plan, dental plan, life insurance, pen-

sion plan, savings and profit-sharing plan, sick pay plan, long and short term disability plans and other statutory benefits. All benefits are offered to eligible employees without regard to sex.

hold" provision does not violate Title VII solely because it may result in a disproportionate impact. Disparate impact is a relevant starting point. It is not conclusive. On its face, the "head of household" provision is neutral; the ability to obtain medical and dental coverage for an associate's spouse is based on the relative earnings of the associate and spouse, rather than the sex of the associate. A proper disparate *treatment* analysis includes examination into the following factors: a) disparate impact of the challenged decision; b) historical background; c) specific events leading up to the decision; d) departure from normal procedures; e) substantive departures; and f) contemporaneous statements by decisionmakers. *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979).

Before assessing each of these factors, we review the evidence presented at trial. The EEOC's first witness, Imogene Slocum, testified that she applied for employment with J.C. Penney in order to obtain medical coverage for herself and her family. Ms. Slocum learned, however, that she was unable to secure coverage for her husband, who earned more than she did, due to the operation of the "head of household" provision. (Tr. pp. 14, 26–28.) The EEOC next presented the expert testimony of an actuary, Paul Barnhart, who concluded that the "head of household" provision is "a very broad shotgun" approach to J.C. Penney's stated objectives. (Tr. p. 96.) Mr. Barnhart suggested that J.C. Penney could have more effectively accomplished its goals by:

utilizing employee surveys to determine its associates' coverage needs (Tr. pp. 111–113);

limiting coverage to those spouses who, regardless of relative income, had no medical coverage and avoid administrative proof problems by relying on the plans' coordination of benefits clause at the time of claim (Tr. pp. 88–89);

directly allowing coverage for those categories of dependent spouses which J.C. Penney indicated they were trying to include through use of the head of household requirement, i.e., unemployed, disabled, full-time students, etc. (Tr. p. 65); and

requiring a higher rate of contribution for an associate's spouse, rather than simply counting the spouse as a dependent (Tr. p. 87).

Mr. Barnhart concluded that J.C. Penney adopted the "head of household" requirement "to substantially continue the status quo that existed prior to the adoption of the rule." (Tr. pp. 108–109.)

During cross examination, however, Mr. Barnhart acknowledged that the procedures utilized by J.C. Penney in making its decision to adopt the "head of household" rule were "acceptable" (Tr. pp. 140–142) and that J.C. Penney's stated objectives were "laudable" and "legitimate." (Tr. pp. 86, 237.) Mr. Barnhart further acknowledged that elimination of benefits for part-time associates was a less favorable alternative to the adoption of the "head of household" requirement. (Tr. pp. 199–200.)

The EEOC next presented the testimony of another expert, Dr. Barbara Zoloth, a labor economist. Dr. Zoloth testified that only 13.2% of J.C. Penney's female associates could be expected to earn more than their husbands, and, therefore, be able to obtain medical and dental plan coverage for them. (Tr. pp. 271, 275.) Dr. Zoloth admitted, however, that her statistics failed to account for those women who were single, divorced or separated and, therefore, would not be in the market for spousal medical plan coverage. (Tr. pp. 309–310.)

In contrast, J.C. Penney offered the deposition testimony of Robert G. Bivona, J.C. Penney's manager of benefits from July 1, 1975 through September 1, 1978. Mr. Bivona testified that J.C. Penney's purpose in adopting the "head of household" rule was to exclude those people who were not dependent upon the Penney Company employees for benefits protection and "allowed that the allocation of resources for the benefits could be properly used to serve the

purpose of providing a comprehensive benefit plan to the employees of the Penney Company, and their eligible dependents." (Dep. Tr. pp. 7–9, May 26, 1982.) Mr. Bivona further testified that J.C. Penney's goal in adopting the "head of household" requirement was "to provide a comprehensive employee benefit program to the employees/associates of the Penney Company, secondarily to provide their eligible dependents a comprehensive benefit program." (Dep. Tr. p. 6, May 26, 1982.) Finally, Mr. Bivona testified that J.C. Penney adopted the "head of household" requirement without first conducting impact studies or considering any alternatives, but that in 1977, J.C. Penney did consider alternatives to the "head of household" requirement, such as the elimination of plan participation for part-time employees and/or all dependants. (Dep. Tr. pp. 17–18, 28, 35, May 26, 1982).

J.C. Penney then submitted the deposition testimony of Nathan Smith, who was Mr. Bivona's predecessor as J.C. Penney's benefits manager and served in that position for nine years. Mr. Smith testified that, prior to adopting the "head of household" requirement, J.C. Penney "stud[ied] the plans of our competitors and cross sections of industries ... and they ran the entire span of benefit plans;" that J.C. Penney adopted the "head of household" requirement for the following reasons:

the company was "getting some pressure" from some of their female associates whose husbands were students, unemployed or disabled (Dep. Tr. p. 6, May 13, 1982);

to "provide the greatest benefits for the people who needed the coverage;"

to come in compliance with the civil rights law (Dep. Tr. p. 7, May 13, 1982); to avoid administrative difficulties up front by asking the associate to submit a W–2 form for his or her spouse (Dep. Tr. pp. 18–20, May 13, 1982).

J.C. Penney also offered the testimony of an actuary, Chester Clark. Mr. Clark admitted that J.C. Penney's decision to adopt the "head of household" requirement was "somewhat subjective," however, that the requirement was adopted "in reliance on the fact that somebody was dependent if they had the smaller income in a husband-wife team." (Tr. pp. 353–354.) Mr. Clark concluded that the "head of household" requirement was reasonable to meet J.C. Penney's objectives in light of the relationship between income and the availability of insurance. Mr. Clark acknowledged, however, that the "head of household" requirement measures only relative, and not gross, income. (Tr. pp. 422–424.) Mr. Clark further acknowledged that he would expect that, under the "head of the household" requirement, more male associates would be able to enroll their spouses than female associates. (Tr. pp. 424–426.)

■ Application of the factors set forth above to this and other evidence produced at trial persuades us that EEOC has not established that a discriminatory purpose was "a motivating factor" in J.C. Penney's decision to adopt the "head of household" rule. J.C. Penney cannot and does not dispute the fact that prior to the adoption of the "head of household" provision on February 1, 1971 its medical plan, which allowed only male associates to enroll their spouses, discriminated against its female associates. One of its principal reasons for adopting the "head of household" provision was "to come in compliance with the civil rights law." Moreover, J.C. Penney has not contended that its "head of household" rule does not have a disproportionate impact on women. Although J.C. Penney challenged some of Dr. Zoloth's calculations, it did not really dispute her basic conclusion that the "head of household" rule does have a disparate impact on females. Even Mr. Clark testified that he expected that more male associates than females would be expected to be able to enroll their spouses under the "head of household" requirement. We have previously held, however, that disparate impact alone is insufficient to make out a case of sex discrimination under § 703(a)(1).

■ The EEOC relies heavily on the historial background leading to the adoption of the "head of household" rule. The

EEOC argues that the fact that J.C. Penney intended to discriminate under its "men only" rule is highly probative of its intent to discriminate when adopting the "head of household" rule because J.C. Penney knew or should have known that this rule would select as eligible substantially the same people as selected under the "men only" rule. We cannot agree that simply because J.C. Penney's "men only" plan for spousal coverage discriminated against women, it intended to discriminate when it adopted the "head of household" provision. J.C. Penney changed its pre-1971 plan to accommodate the announced needs of its female employees and they did so after a comprehensive study and examination of various plans then in existence. The evidence persuades us that, although the "head of household" provision did not qualify all male spouses for coverage, literally thousands did in fact qualify. Similary, a significant number of previously eligible female spouses were disqualified. We conclude that the "head of household" test is a neutral method for determining eligibility for benefits and entirely permissible under Title VII.

The specific events leading to J.C. Penney's decision to adopt the "head of household" rule is in our view more persuasive than this historical background and reveals no discriminatory purpose, notwithstanding an incidental disparate impact. Messrs. Smith and Bivona set forth J.C. Penney's rationale and purpose for adopting the "head of household" provision. Mr. Smith testified that J.C. Penney was getting pressure from its younger female associates with student husbands who required coverage, which was not otherwise available to them under any other plan; that a number of its female associates wanted to obtain coverage for their husbands who were no longer employed and some who had become disabled. Further, Mr. Smith testified that the "head of household" rule was adopted "because we understood that there were some questions about the definition that was in the plan and that we were trying to come in compliance with the law as we interpreted it at that time. Finally, Mr.

Smith testified that, prior to adopting the "head of household" requirement, J.C. Penney conducted a study of several benefit plans offered by other retail and non-retail employers.

Mr. Barnhart, on behalf of EEOC, testified that J.C. Penney should have conducted surveys to determine the actual needs of its associates and their dependents to determine a more effective way to accomplish J.C. Penney's stated goals. We think this and other suggestions made by Mr. Barnhart are mere judgment calls. It would be reasonable for ·others to disagree. Mr. Barnhart did find, for example, that procedures J.C. Penney followed were acceptable and its reasons for adopting the "head of household" rule were legitimate and laudable. With regard to employee surveys, Mr. Clark testified that such surveys were not necessary and would pose financial and administrative problems. We note that EEOC did not present any testimony that any of the alternative methods described by Mr. Barnhart would result in a greater number of J.C. Penney's female associates being able to obtain coverage for their spouses.

Each party offered the expert testimony of an actuary to establish J.C. Penney's intent through procedures used in arriving at its decision to adopt the "head of the household" requirement. Mr. Barnhart, on behalf of EEOC, gave several alternatives that J.C. Penney could have followed, suggesting that its failure to do so stemmed from a discriminatory motive. Mr. Barnhart testified that the two most reasonable alternatives that J.C. Penney could have considered were: first, a change in the premium rate structure to include a separate higher premium for spouses, and second, include a requirement that spouses prove that they were uninsured. Mr. Barnhart further suggested as an alternative the elimination from coverage of part-time associates and the offering of insurance only to unemployed spouses. It is apparent that the elimination of part-time employees would have denied coverage for the greatest number of J.C. Penney's employ-

ees. It is equally apparent that unemployed spouses did in fact qualify for coverage under the "head of household" requirement. In fact, Mr. Smith testified that J.C. Penney did consider a change in the rate structure at the time it adopted the "head of household" provision but rejected it as unacceptable because "we felt we would be hurting too many of our people" and because "we had a fairly large number of part-time people and it was rather important for us to reach these people." Apart from offering the testimony of Mr. Barnhart, the EEOC did not demonstrate that any of the alternatives suggested were in fact less discriminatory than the plan adopted by J.C. Penney. There was nothing in the evidence, for example, to suggest that requiring proof of no insurance was an effective or practical alternative or that it was less discriminatory. The EEOC simply did not produce persuasive evidence that J.C. Penney made any substantive departures from normal procedures in its decision to adopt the "head of household" rule.

We find that EEOC's contention that the "head of household" requirement is so uncommon that its adoption by J.C. Penney can only be explained by an intent to discriminate against women is without merit. The evidence disclosed at least three other large employers who have adopted a relative earnings requirement. The EEOC must have thought it common enough to issue a guideline, which no doubt discouraged others from adopting the provision. Finally, EEOC contends that the actual effect of the "head of household" test has been to exclude female employees from obtaining spousal coverage. The evidence, however, has demonstrated otherwise. The "head of household" rule in actuality has made insurance available to thousands of spouses of female employees of J.C. Penney, and the evidence clearly demonstrates that those who were disqualified in all probability had insurance coverage available from their own employers. J.C. Penney could be this selective and still not violate Title VII.

The only evidence containing contemporaneous statements by J.C. Penney decision-makers is a November 11, 1970 memorandum, which was submitted by the parties as Joint Exhibit 6. J.C. Penney forwarded this memorandum to its local store managers to announce the adoption of the "head of household" requirement. This memorandum contains completely neutral language that evidences no intent on the part of J.C. Penney to discriminate against its female associates.

In sum, EEOC has failed to demonstrate that the "head of the household" requirement constitutes disparate treatment of J.C. Penney's female associates. While there is no real dispute that J.C. Penney historically discriminated against its female associates in their ability to obtain spousal coverage under its pre-1971 medical plan, and that the "head of the household" requirement has a disparate impact on females, these factors do not amount to disparate treatment. The evidence presented, which is relevant to the remainder of these factors, is devoid of any discriminatory intent on the part of J.C. Penney in adopting the "head of the household" requirement. Mr. Barnhart testified that he would attempt to accomplish the goals sought by J.C. Penney through alternate methods and by employing different procedures such as conducting employee surveys. The EEOC did not present any evidence, through Mr. Barnhart or otherwise, that any of the methods he suggested would have resulted in a rule that would lessen the disparate impact on J.C. Penney's female associates with respect to their ability to obtain medical and dental coverage for their spouses. Similarly, EEOC did not present any evidence that Mr. Barnhart's suggested pre-adoption procedures would enhance the ability of female associates to obtain spousal coverage. We agree with Mr. Barnhart that J.C. Penney's purpose and objectives in adopting the "head of the household" requirement were legitimate and laudable. We further agree that the procedures employed by J.C. Penney prior to its adoption of the rule were acceptable. We do not agree, however, that the "head of the household" requirement is an inappropriate

procedure for accomplishing those objectives.

With the record virtually devoid of evidence of discriminatory intent on the part of J.C. Penney in adopting the "head of the household" requirement, we discredit Mr. Barnhart's conclusion that J.C. Penney's adoption of the rule was merely a pretext in order to substantially continue the discriminatory status quo. We conclude that EEOC has failed to sustain its burden of showing that J.C. Penney's "head of the household" requirement violates § 703(a)(1) by discriminating on the basis of sex. Accordingly, judgment will be entered for defendant, and the plaintiff's complaint will be dismissed.

IT IS SO ORDERED.

## APPENDIX

### MEMORANDUM OPINION

The Equal Employment Opportunity Commission (EEOC) filed this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, alleging that the "head of household" eligibility requirement contained in J.C. Penney Company's (J.C. Penney) medical and dental plan is discriminatory. J.C. Penney's plan provides coverage for an employee's spouse only when its employee's earned income is greater than 50% of the combined earnings of the employee and his/her spouse. The EEOC contends that this provision has a disparate impact on women employees because those denied spousal coverage by this requirement are predominantly female, while those included are predominantly male. The EEOC argues that a disparate impact is sufficient to establish a *prima facie* showing of sex discrimination in employment, a violation of Title VII. On the other hand, J.C. Penney denies that its head of household eligibility requirement has a disparate impact. J.C. Penney argues that even if it does, proving a disparate impact with respect to a benefit such as spousal insurance, which is only a part of a comprehensive program of insurance benefits would not make a *prima facie* case of sex discrimination under Title VII.[1]

J.C. Penney's "head of household" eligibility requirement for spousal insurance coverage has recently been reviewed by the Ninth Circuit. *Wambheim v. J.C. Penney Co., Inc.*, 642 F.2d 362 (9th Cir.1981). *Wambheim* held that the disparate impact analysis set forth in *Griggs v. Duke Power Company*, 401 U.S. 424 [91 S.Ct. 849, 28 L.Ed.2d 158] (1971), was applicable to establish a *prima facie* case of sex discrimination with respect to the "head of household" requirement for dependent coverage.[2] We respectfully disagree. Initially, we note that Title VII contains two applicable provisions, §§ 703(a)(1) and 703(a)(2). *Griggs* was decided under § 703(a)(2). *Id.* at 426, n. 1 [91 S.Ct. at 851, n. 1]. The language in § 703(a)(1) is substantially different from § 703(a)(2). Section 703(a)(2) makes it an illegal employment practice for an employer:

> to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex or national origin.

Thus, § 703(a)(2) is concerned with classifications of employees (or applicants) which in any way "would deprive or tend to deprive" or otherwise adversely affect an employee's status or job opportunities. This language makes it appropriate to shift the burden to the employer to prove a business

---

**1.** In addition to a medical and dental plan, J.C. Penney's comprehensive benefit program includes provisions for sick pay and long-term disability, a discount plan, pension plan, life insurance and a savings and profit-sharing plan. Affidavit of R.T. Messinger.

**2.** The term "prima facie case" as used in Title VII litigation was defined as a description of plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 [101 S.Ct. 1089, 67 L.Ed.2d 207] (1981).

purpose for the classification when a tendency to deprive or adversely affect a protected group is shown. Disparate impact is sufficient to establish a *prima facie* case because claims of disparate impact "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive ... is not required...." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335, n. 15 [97 S.Ct. 1843, 1854–55, n. 15, 52 L.Ed.2d 396] (1977). In other words, a showing that the policy tends to adversely affect job opportunities or status is sufficient.

Under § 703(a)(1) it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin." It is apparent that this language is not as broad as that contained in (a)(2) which makes it an unlawful employment practice ["]to deprive any individual of employment opportunities or otherwise adversely affects his status as an employee."

The Supreme Court's analysis of pregnancy disability points out the difference between allegations that state a claim under § 703(a)(1) and those that are properly considered under § 703(a)(2). In *Nashville Gas Company v. Satty*, 434 U.S. 136 [98 S.Ct. 347, 54 L.Ed.2d 356] (1977), the Court considered two company policies involving employee maternity leave. The company did not pay sick leave benefits to women who were on maternity leave, nor were women who had been on maternity leave allowed to return to their former job. Moreover, an employee returning from maternity leave was denied all seniority and had to wait for a position which was not desired by another employee with seniority. Maternity leave was the only leave treated in this fashion. Although facially neutral, the Court found that depriving employees returning from pregnancy leave of their accumulated seniority did "adversely affect [their] status as an employee," and thus made out a violation of § 703(a)(2). *Nashville Gas Company v. Satty, supra*, at 141 [98 S.Ct. at 351]. But, the Court stated that it was difficult to perceive how exclusion of pregnancy from a disability insurance plan "would deprive any individual of employment opportunities" or "otherwise adversely affect his status as an employee." The Court held that a denial of sick leave pay, although financially burdensome for a woman, did not affect her employment opportunities or status as an employee and was therefore to be considered under § 703(a)(1). *Id.* at 144–45 [98 S.Ct. at 352–53]. Though not reaching the issue whether a disparate impact analysis applies to § 703(a)(1) since plaintiff had not established a disparate impact, the Court remanded the sick pay issue for a determination whether this denial was a mere pretext for discrimination. *Id.* at 145–46 and n. 6 [98 S.Ct. at 353–54 and n. 6]. The Court in *Satty* observed, paraphrasing § 703(a)(2):

> [I]t is difficult to perceive how exclusion of pregnancy from a disability insurance plan or sick leave compensation program "would deprive any individual of employment opportunities" or otherwise adversely affect his status as an employee in violation of § 703(a)(2). The direct effect of the exclusion is merely a loss of income for the period the employee is not at work; such an exclusion has no direct effect upon either employment opportunities or job status. Plaintiff's attack in [*General Elec. Co. v.* ] *Gilbert* [429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976) ] was brought under § 703(a)(1), which would appear to be the proper section of Title VII under which to analyze questions of sick-leave or disability payments.

*Id.* at 144–45 [98 S.Ct. at 352–53].

Similarly, J.C. Penney's "head of household" requirement for spousal coverage has no affect upon either employment opportunities or job status. Rather, there is a potential economic loss that is even less direct than the failure to pay sick leave. The economic loss is to the employee's fam-

ily unit, a unit which by definition contains at least one other wage earner. Thus, the "head of household" requirement can be challenged only under § 703(a)(1). In *General Electric Co. v. Gilbert*, 429 U.S. 125 [97 S.Ct. 401, 50 L.Ed.2d 343] (1976), the Court stated that the word "discriminate" in § 703(a)(1) should be construed similarly to cases under the fourteenth amendment's Equal Protection Clause.

While there is no necessary inference that Congress, in choosing this language, intended to incorporate into Title VII the concepts of discrimination which have evolved from court decisions construing the Equal Protection Clause of the Fourteenth Amendment, the similarities between the Congressional language and some of those decisions surely indicate that the latter are a useful starting point in interpreting the former. Particularly in the case of defining the term "discrimination," which Congress has no where in Title VII defined, those cases afford an existing body of law analyzing and discussing that term in a legal context not wholly dissimilar to the concerns which Congress manifested in enacting Title VII.

*General Electric v. Gilbert*, 429 U.S. at 133 [97 S.Ct. at 406–07]. It is clear that, unlike the *Griggs* disparate impact analysis used to establish a *prima facie* case under § 703(a)(2), a *prima facie* case of discrimination under the Fourteenth Amendment Equal Protection Clause requires proof of intent. *Washington v. Davis*, 426 U.S. 229, 236–39 [96 S.Ct. 2040, 2045–47, 48 L.Ed.2d 597] (1976). The Court has twice recognized that requirements for establishing a *prima facie* case under § 703(a)(1) and § 703(a)(2) may be different. *General Electric Co. v. Gilbert, supra* [429 U.S.], at 136–7 [97 S.Ct. at 408–09]; *Nashville Gas Company v. Satty, supra* [434 U.S.], at 144 [98 S.Ct. at 352]; *cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–06 [93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668] (1973). The Court has indicated that a disparate impact analysis may not be ap-

propriate under § 703(a)(1) and that a showing of intent may be required.

In those cases in which the Supreme Court agreed that plaintiff carried the burden of establishing a *prima facie* case under § 703(a)(1), the plaintiff was proceeding under the theory of disparate treatment. *See, e.g., McDonnell Douglas Corp. v. Green, supra* at 802 n. 14 [93 S.Ct. at 1824 n. 14]; *International Brotherhood of Teamsters v. United States, supra* [431 U.S.] at 335–36, n. 15 [97 S.Ct. at 1854–55, n. 15]; *Texas Department of Community Affairs v. Burdine*, 450 U.S. [at 253, n. 5, 101 S.Ct. at 1093, n. 5] 49 U.S.L.W. 4214, 4215, n. 5. Here, disparate treatment means that "[t]he employer has simply treated some people less favorably than others because of their race, color, religion, sex or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of difference in treatment." *International Brotherhood of Teamsters v. United States, supra* [431 U.S.] at 335 n. 15 [97 S.Ct. at 1854–55 n. 15]. Disparate treatment was the most obvious evil Congress intended to address when it enacted Title VII. Section 703(a)(2) is much broader than this and under some circumstances applies to situations of disparate impact. *Griggs v. Duke Power Co., supra.* However, an employer is not required by Title VII to provide fringe benefits to employees merely because the economic impact of not providing that benefit falls more harshly upon members of a protected group, *General Electric Co. v. Gilbert, supra* [429 U.S.], at 136–40 [97 S.Ct. at 408–10]; *Nashville Gas Co. v. Satty, supra* [434 U.S.] at 145 [98 S.Ct. at 353], nor does Title VII require an employer to show preferential treatment to protected groups. Section 703(j); 42 U.S.C. § 2000e–2(j). The different language in §§ 703(a)(1) and 703(a)(2) demonstrates Congress' concern with different approaches for achieving equal opportunity in employment. Section 703(a)(1) reflects concern with "discrimination." Section 703(a)(2) reflects, in its choice of

language, an intent to include the broader aspects of employment. There is in § 703(a)(2), therefore, an invitation to apply a disparate impact analysis. Section 703(a)(1) does not contain such an invitation and we can find no reason to imply one:

> The concept of "discrimination," of course, was well known at the time of the enactment of Title VII, having been associated with the Fourteenth Amendment for nearly a century, and carrying with it a long history of judicial construction. When Congress makes it unlawful for an employer to "discriminate ... because of ... sex ...," without further explanation of its meaning, we should not readily infer that it meant something different from what the concept of discrimination has traditionally meant...." There is surely no reason for any such inference here.

*General Electric Co. v. Gilbert, supra* [429 U.S.], at 145 [97 S.Ct. at 412–13] (citations deleted). We define the word "discriminate" as suggested by *Gilbert,* to be consistent in definition with the word as used in the law developed under the Fourteenth Amendment and to include an element of discriminatory motive. *See, e.g., Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265–66 [97 S.Ct. 555, 563–64, 50 L.Ed.2d 450] (1977).

Accordingly, an order will be entered consistent with this opinion.

IT IS SO ORDERED.

/s/ Robert E. DeMascio
Robert E. DeMascio
United States District Judge

Dated: November 16, 1981